J-S06032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: C.S.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: W.H., MOTHER | No. 2491 EDA 2016 |

Appeal from the Order Entered July 12, 2016
in the Court of Common Pleas of Philadelphia County Family Court
at No(s):CP-51-AP-0000907-2015
CP-51-DP-0001979-2012
FID:51-FN-002936-2012

| | |
|---|---|
| IN THE INTEREST OF: C.B.-A.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: W.H., MOTHER | No. 2492 EDA 2016 |

Appeal from the Order Entered July 12, 2016
in the Court of Common Pleas of Philadelphia County Family Court
at No(s): CP-51-AP-0000908-2015
CP-51-DP-0001978-2012
FID: 51-FN-002936-2012

| | |
|---|---|
| IN THE INTEREST OF: C.D.R., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: W.H., MOTHER | No. 2493 EDA 2016 |

Appeal from the Order Entered July 12, 2016
in the Court of Common Pleas of Philadelphia County Family Court
at No(s): CP-51-AP-0000909-2015
CP-51-DP-0001977-2012
FID: 51-FN-002936-2012

J-S06032-17

IN THE INTEREST OF: C.C.R., A MINOR

APPEAL OF: W.H., MOTHER

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 2494 EDA 2016

Appeal from the Order Entered July 12, 2016
in the Court of Common Pleas of Philadelphia County Family Court
at No(s): CP-51-AP-0000910-2015
CP-51-DP-0002014-2013
FID: 51-FN-002936-2012

BEFORE: MOULTON, RANSOM, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:  **FILED APRIL 24, 2017**

W.H. ("Mother") appeals[1] from the orders of the Philadelphia Court of Common Pleas that terminated her parental rights to her four children, C.S.H., C.B.-A.R., C.D.R., Jr., and C.C.R. (collectively, "Children"), and changed the permanency goals for Children to adoption.  Mother asserts that the trial court erred in terminating her parental rights under 23 Pa.C.S. 2511(a)(1), (2), (5), (8), and (b) and in changing the goal for Children from reunification to adoption.  We affirm.

C.D.R., Jr. is a male born in July 2007.  C.B.-A.R. is a female born in January 2009.  C.S.H. (aka C.R.) is a male born in March 2011.[2]  C.C.R. is a male born in May 2013.  The trial court has thoroughly summarized the

---

[*] Former Justice specially assigned to the Superior Court.

[1] The appeals of Childrens' father, C.R. ("Father"), are listed at J-S06031-17.

[2] The trial court referred to C.S.H. as C.R.  We use C.S.H. for the sake of consistency.

- 2 -

history of the family's contacts with the Philadelphia County Department of

Human Services ("DHS") as follows:

> On September 10, 2012, [DHS] received a General Protective Services (GPS) Report alleging that . . . Mother. . . and Father . . . failed to provide their three [c]hildren: C.D.R., Jr., C.B[.]-A.R., and [C.S.H.], with adequate food and safe housing. The Report alleged that Mother and Father only fed the Children once a day; that there was a limited amount of food in the family's home; that there had been no running water in the home for the last eight months; and that the [three c]hildren are unable to bath[e] and appeared to be very dirty. The Report further alleged that the family's home was dirty; that the home was malodorous due to standing waste in the toilet; that Father was employed; that he used drugs and drank alcohol excessively; that Mother is unemployed and appeared to be depressed. The Report was substantiated.
>
> DHS made numerous attempts to assess the [c]hildren's safety, without success, and subsequently filed dependent petitions for the [the three children].
>
> Adjudicatory Hearings for three [c]hildren: C.D.R., Jr., C.B[.]-A.R., and [C.S.H.] were held on November 9, 2012 before Judge Thomas M. Nocella. The Court finds that temporary legal custody of the [three c]hildren to be given to DHS and placement in Foster Care. Supervised visitation for the parents at DHS as arranged by the parties. [The three c]hildren referred to Child Link for Early Intervention Services. DHS to obtain birth certificates. DHS to explore appropriate family members as possible placement resource. [The three c]hildren may be reunified with parents if appropriate, DHS to do home evaluation. ACS may submit administrative order discharging commitment and implementing once Children are reunified. FSP meeting within 30 days.
>
> On December 21, 2012 a hearing was held and the Children were found not to be dependent and any temporary legal and physical custody by DHS to be discharged. Children reside with parents and are safe as of December 20, 2012.

On April 19, 2013, DHS received a GPS Report alleging that [C.S.H.] was diagnosed with neurofibromatosis; that Mother was first asked to take Child to St. Christopher's Hospital for Children for an evaluation in November 2012; that several appointments were made for Mother and Father to take the [c]hild for an evaluation; and that the [c]hild still has not been evaluated. The Report alleged that there was concern regarding the [c]hild's development and the psychological effect that the disease could cause; that neurofibromatosis attacks the central nervous tissue; and that the [c]hild was developmentally delayed.

On April 24, 2013, DHS and the DHS visiting nurse made a joint visit to the family's home to investigate the allegations of the GPS Report. Mother and Father stated that they were not aware of the appointments for [C.S.H.]. Father stated that he did not know that the [c]hild's doctor wanted him to take the [c]hild for an evaluation for neurofibromatosis and that the doctor did not discuss the [c]hild's condition with him.

DHS subsequently learned that C.B[.]-A.R. was also diagnosed as suffering from neurofibromatosis.

DHS also learned that C.B[.]-A,R. has severe behavioral issues and is prescribed medication. Mother stated that she does not provide the [c]hild with her medication because she believes that it makes her behavior worse.

On May 29, 2013, Mother gave birth to C.C.R. DHS referred the family for Rapid Service Response Initiative (RSRI) to assist with scheduling the Children's appointments.

On July 9, 2013, DHS implemented In-Home Protective Services (IHPS) through the Family Support Center.

On or about September 11, 2013, DHS learned that the family was scheduled to be evicted from their home on September 15, 2013. IHPS spoke with Father about the family's planned living arrangements and Father stated that the family would be residing with relatives; however,

Father became evasive and failed to provide IHPS with an address.

On September 17, 2013, IHPS went to the home. The family could be heard inside of the apartment; however, no one answered the door.

On September 18, 2013, DHS attempted to visit the family, without success.

On October 15, 2013, a hearing for all the Children was held before the Honorable Allan L. Tereshko. Adjudication was deferred, DHS to supervise. Mother referred to [Behavioral Health Services (BHS)] for consultation/evaluation. DHS to re-inspect the home within seven days. IHPS through family supports to continue. Parents to comply with all services and recommendations, cooperate with DHS, Agency and Child Advocate. Safety to be provided at next Court date.

DHS learned that C.C.R. was also diagnosed as suffering from neurofibromatosis.

An Adjudicatory Hearing was held on November 4, 2013 before Judge Allan L. Tereshko. The [c]ourt adjudicated the four Children Dependent and committed them to DHS. Physical custody of the Children to remain with the parents, subject to the conditions and limitations as the Court prescribes, including supervision. DHS to implement family finding, and referral to Family School. Mother and Father to be referred to and receive a Parenting Capacity Evaluation. Mother is referred to [the Clinical Evaluation Unit (CEU)] for an assessment, dual diagnosis and a forthwith drug screen (to include alcohol). FSP meeting is to occur within 30 days.

A Permanency Review Hearing was held on February 7, 2014 before Judge Allan L. Tereshko, who found that DHS shall maintain legal custody of the Children. The Children are placed in Foster Care through PCV, (Presbyterian Children's Village). Mother and Father to have weekly supervised visits with the Children at Agency. Father completed parenting capacity evaluation. Mother to attend Family School. Mother and Father re-referred to CEU for

forthwith drug screen (to include alcohol), dual diagnosis assessment and monitoring. Mother and Father to attend Children's medical appointments. Mother to attend parenting capacity evaluation scheduled for 2/12/2014. Father to complete part 2 of parenting capacity evaluation. Mother and Father to attend ARC [Achieving Reunification Center] program and comply with CEU recommendations. DHS to re- evaluate parent's home. As to C.D.R., Jr., he is receiving therapy at PCV and receives intense tutoring at school. As to C.B[.]-A.R., she is scheduled to be evaluated at Easter Seals. She had an eye evaluation and is in need of glasses, and continues to be monitored at St. Christopher's for medical disorder. As to [C.S.H.], he is receiving sign language, speech therapy and occupational therapy. He has been referred to Center for Autism. As to C.C.R., he is receiving WIC services, and will follow up at St. Christopher's regarding genetic disorder on 3/9/2014. He is attending daycare.

On May 2, 2014, CEU submitted a Progress Report as to Father, which stated that Father failed to comply with the Court ordered drug and alcohol assessment in that he was a no call/no show for his scheduled appointment on 3/6/2014. The Report also stated that Father's drug screen on 2/7/2014 was positive for cocaine and marijuana. A Permanency Review Hearing was held on May 9, 2014 before Judge Kevin M. Dougherty, who found that DHS shall maintain legal custody of the Children. The Children are placed in Foster Care through PCV. Mother and Father to have supervised visits with the Children at Agency. Regarding Mother, there has been moderate compliance with the permanency plan, in that Mother receives services through ARC, mental health services through Community Counsel, complied with first part of parenting capacity evaluation. Mother receives services through Family School. Regarding Father, there has been minimal compliance with the permanency plan, in that Father was noncompliant with FSP objectives, services and recommendations. Father was referred to ARC, and Father did not comply with second half of parenting capacity evaluation (rescheduled 3 times). Report submitted from CEU for Father. As to C.D.R., Jr., the Child is doing well. As to C.B[.]-A.R., the Child is doing well and receives 45 minutes of special instruction in daycare, and medical

treatment through St. Christopher's Hospital. As to [C.S.H.], he is doing well and receiving services through Elwyn. As to C.C.R., he is doing well and referred to Child Link Early Intervention Services, no services recommended.

A Permanency Review Hearing was held on June 20, 2014 before Judge Walter Olszewski, who found that DHS shall maintain legal custody of the Children. The Children shall remain in Foster Care through The Village. Regarding Mother, there has been full compliance with the permanency plan. Regarding Father, there has been minimal compliance with the permanency plan. Father is re-referred to CEU for an assessment and forthwith drug screen. Father is to complete second portion of parenting capacity evaluation scheduled for 7/15/2014. DHS to re-refer Father to ARC. Mother is referred to BHS for consultation/evaluation, and is to sign releases of information. Children are authorized to travel with foster parent to South Carolina from 8/16/2014 through 8/23/2014. All specific information regarding the vacation/trip is to be provided to counsel.

On June 24, 2014, Mother underwent a [parent capacity evaluation (PCE)] conducted at Assessment & Treatment Alternatives, Inc., (ATA) by William Russell, Ph.D., and Samantha Brenner, M.A. The PCE stated that there are several barriers to Mother providing safety and permanency to the Children; that those barriers include a minimization of the role she played in the situation which precipitated DHS involvement and the inability to acknowledge her Children's behavioral problems; that she also minimizes Father's drug use; that Mother neglected to take responsibility for her Children not receiving appropriate medical treatment; that she projected blame on the City for the removal of her Children; and that she denied all allegations that her home was unkempt, chaotic, and that the Children were not up to date on their immunizations. The PCE also stated that Mother was diagnosed with persistent depressive disorder and that she does not function well in complex situations. The PCE recommendations were for Mother to obtain appropriate housing with an adequate number of bedrooms for her Children; that the home be inspected frequently to assess

for safety hazards and/or the home being unkempt, that the home be affordable based on income; that she obtain employment; that she participate in available programming to help parents continue to develop skills as well as receive professional and peer support; that she receive psychoeducation on the seriousness of the Children's medical needs and the importance of taking them to their medical appointments; and that Mother should participate in individual therapy to assess her with understanding her depressed mood and increasing her ability to anticipate problems.

On July 2, 2014, Mother underwent a Psychological Evaluation which was conducted by Stacey A. Summers, Psy.D. The Evaluation stated that most of Mother's problems can be directly related to her cognitive deficits; that she can become easily overwhelmed and confused, which impedes her functioning in daily life; that Mother would benefit from case management services geared toward individuals with intellectual disabilities; that without these support services, Mother would likely have difficulty securing the resources necessary to have her Children return to her care; and that it was recommended that Mother participate in individual outpatient therapy in order to handle her current life stressors as well as to manage her anxious and depressive symptoms.

On[ ] July 15, 2014, Father underwent a PCE at ATA conducted by Dr. Russell and Dr. Brenner. The PCE stated that Father minimizes the role he played in the situation which precipitated DHS involvement; that he failed to acknowledge any DHS concerns; he indicated the reason his Children were removed was due to false allegations of safety hazards in the home; that he failed to recognize any behavior problems with the Children; that he glossed over any financial problems; and he projected blame on DHS for his inability to afford and purchase a suitable home. The PCE recommendations were for Father to participate in drug and alcohol treatment with random drug screens; that he and Mother should attend couples counseling to address any past and/or current issues in their relationship; that he should obtain suitable and stable housing; that the home should have enough bedrooms to accommodate the Children; that the home should be

inspected for safety hazards prior to the Children being allowed to reside there; and that the home should be affordable based on income.

On August 29, 2014, CEU submitted a Report as to Father, which referred him to outpatient drug and alcohol treatment.

A Permanency Review Hearing was held on September 2, 2014 before Judge Kevin M. Dougherty, who found that DHS shall maintain legal custody of the Children. The Children shall remain in Foster Care through The Village. Mother and Father have weekly supervised visits with the Children. A referral for therapeutic visits between the parents and Children is to be made forthwith. Mother and Father completed their Parenting Capacity Evaluations. Mother's Psychological Evaluation from BHS has been distributed to all parties. Mother to continue with mental health treatment and Father is to continue his through ARC program. Father is re-referred to CEU for a forthwith screen and assessment with four random drug screens prior to the next court date. DHS is to explore D&A treatment and mental health options for Father. Mother is to be referred for Intellectual Disability Services [(IDS)]. Dr. Russell to write up an Addendum after receiving and reviewing Mother's Psychological Evaluation from BHS. As to C.D.R., Jr., he is not receiving any special services at this time and is doing well. He completed his therapy through the Village. As to C.B[.]-A.R., she receives medical follow up for her condition through St. Christopher's. She completed an MRI with an ER scheduled ultrasound today. Child attends school with a current IEP. As to [C.S.H.], he receives occupational, speech and special instruction services through DE County Intermediate Unit. MRI scheduled for 9/10/2014. As to C.C.R., he receives appropriate services through DuPont.

On December 1, 2014, CEU submitted a Report as to Father, which stated that on 10/15/2014 Father reported that he was engaged in drug and alcohol treatment at Gaudenzia, and that per Guadenzia Outreach staff, Father is not now and has never been enrolled in treatment through their facility.

A Permanency Review Hearing was held on December 2, 2014 before the Honorable Allan L. Tereshko, who found that DHS shall maintain legal custody of the Children. The Children shall remain in Foster Care through The Village. Mother and Father have weekly supervised visits with the Children, supervised with Parents Therapeutic through ATA. Mother has been in substantial compliance with permanency plan, Mother complying with FSP objectives, services and recommendations, completed Parenting Capacity Evaluation, receives mental health services through Community Counsel and attends Family School. Father has been in substantial compliance with permanency plan, Father was referred to ARC for services, receives drug and alcohol counseling through Gaudenzia. Father did complete Parenting Capacity Evaluation, currently not participating in couples counseling. Father complying with all FSP objectives, services and recommendations. Mother referred to IDS Services, DHS did make referral to ATA for Addendum for PCE for Mother. Mother to provide social security card and birth certificate to DHS. Father referred back to CEU for monitoring, forthwith full drug and alcohol screen and three random screens prior to next court date. Parents to sign release of information, comply with FSP objectives, services and recommendations. As to [C.S.H.], foster parent gave notice due to Child's behaviors.

On February 4, 2015, DHS held a FSP meeting. The permanency goal for the Children was changed to "Adoption."[3] The parental objectives for Mother were to maintain all appointments for the Children and comply with all treatment recommendations; to make herself available to discuss any issues regarding the Children; to call to confirm prior visits; to participate in court ordered mental health evaluations and sign releases of information; to comply with all treatment recommendations including therapy and or medication management as prescribed; to ensure that the health or safety hazards at the residence are corrected, such as exposed wiring, securely covered heating system, and a functioning toilet; to ensure that all

---

[3] The dockets reveal that a concurrent plan of adoption was set forth in the trial court's December 2, 2014 and May 18, 2015 permanency orders.

utilities remain operable at all times; to attend Family School; and to obtain employment. The parental objectives for Father were to attend all appointments for the Children and comply with all treatment recommendations; to make himself available to discuss any issues regarding the Children; to call to confirm prior to visits; to participate in family therapy with Mother; to participate in drug and alcohol treatment and comply with all recommendations; to participate in services through ARC; to ensure that the health or safety hazards at the residence are corrected, such as exposed wiring, securely covered heating system, and a functioning toilet; to ensure that all utilities remain operable at all times.

On February 26, 2015, Mother participated in a PCE Addendum at ATA conducted by Dr. Russell and Ms. Peterson. The PCE Addendum stated that Mother was unable to demonstrate any notable progress since her last evaluation in developing the capacity to provide for her Children; that there remains concerns regarding her capacity to provide safety and permanency to her Children; that she continues to minimize the role she and the Father played in the situation which precipitated DHS involvement; that she continues to not acknowledge the Children's behavioral problems/special needs; that she has yet to acquire appropriate housing; that she continues to be unemployed; that, despite recommendations from two separate evaluations, she has yet to enroll in mental health treatment; and that, in light of the lack of progress, her cognitive limitations, and her difficulty recognizing her Children's needs, an intensive case manager should be assigned to her case. The PCE Addendum also stated that Mother appeared to be functioning in the borderline range in intelligence and a diagnosis of Intellectual Disability, Mild should be explored.

On March 2, 2015, CEU submitted a report as to Father, which stated that Father failed to provide verification of his enrollment in drug and alcohol treatment.

A Permanency Review Hearing was held on March 3, 2015 before the Honorable Allan L. Tereshko, who found that DHS shall maintain legal custody of the Children. The Children shall remain in Foster Care through The Village.

Mother and Father to have weekly supervised visits with the Children at the Agency for one hour. CEU Report as to Father is incorporated into the record by reference. Father referred to the CEU unit for a forthwith drug screen, 3 randoms, assessment, and monitoring.

On May 14, 2015, CEU submitted a progress report as to Father, which stated that Father failed to comply with the Court ordered drug and alcohol assessment in that he was a no call/no show for his scheduled appointment on 4/6/2014. The Report also stated that Father did go to CEU on 5/11/2015, but failed to reschedule an appointment to be assessed.

A Permanency Review Hearing was held on May 18, 2015 before the Honorable Allan L. Tereshko, who found that DHS shall remain in legal custody of the Children. The placement of the Children shall remain in a Pre-Adoptive Home through The Village. Mother and Father are offered weekly supervised visits with the Children at the Agency. As to C.D.R., Jr., he receives Child Guidance therapy services, speech therapy and attends school. As to C.B[.]-A.R., she receives individual therapy through PCV, and is scheduled for an Autism evaluation of 6/16/[2015]. As to [C.S.H.], he attends Easter Seals and receives speech, occupation and special instruction services. He has been diagnosed with Autism and will receive appropriate wrap around services. As to C.C.R., he receives speech therapy. Mother has been referred to IDS Services, and referred to BHS for consultations and evaluations. Father is re-referred for an updated PCE, and is referred to CEU for assessment, forthwith screen and three random drug screens prior to next court date.

A Permanency Review Hearing was held on September 1, 2015 before the Honorable Allan L. Tereshko, who found that DHS shall remain in legal custody of the Children. The placement of the Children shall remain in Foster Care through The Village. Mother and Father are offered weekly supervised visits with the Children at the Agency for one hour. Father is to report for his PCE Addendum on 10/15/2015. DHS is to forward copy of PCE to all parties. Family School is discharged.

C.B[.]-A.R., [C.S.H.], and C.C.R. are diagnosed as suffering from neurofibromatosis, which is a genetically-inherited disorder in which the nerve tissue grows tumors (neurofibromas) that may be benign and may cause serious damage by compressing nerves and other tissues. The disorder affects all neural crest cells (Schwann cells, melanocytes, and endoneurial fibroblasts). Cellular elements from these cell types proliferate excessively through the body, forming tumors; melanocytes also function abnormally in this disease, resulting in disordered skin pigmentation and café au lait spots. The tumors may cause bumps under the skin, colored spots, skeletal problems, pressure on spinal nerve roots, and other neurological problems. Neurofibromatosis is an autosomal dominant disorder, which means only one copy of the affected gene is needed for the disorder to develop. Therefore, if only one parent has neurofibromatosis, his or her children have a 50 percent chance of developing the condition as well.

Father is diagnosed as suffering from neurofibromatosis.

Mother is diagnosed with persistent depressive disorder.

Trial Ct. Op., 10/11/16, at 3-17 (record citations omitted).

On December 22, 2015, DHS filed the petitions to terminate Mother's and Father's parental rights to Children under 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). That same day, DHS filed petitions for a goal change to adoption.

The trial court held hearings on April 20, 2016, and July 12, 2016. On July 12, 2016, the court entered the orders terminating Mother's parental

rights to Children and changing the goal to adoption. These timely appeals followed.[4]

Mother presents the following questions for review:

1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights under 23 Pa.C.S. § 2511 (a)(1), where the evidence showed that Mother substantially complied with the Family Service Plan goals established by the [DHS]?

2. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights under 23 Pa.C.S. § 2511 (a)(2), (5), and (8) where [DHS] failed to prove by clear and convincing evidence that Mother's conduct warranted involuntary termination?

3. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights without fully considering the impact of termination on the emotional needs and welfare of the Children, as required under 23 Pa.C.S. § 2511(b)?

4. Did the trial court commit an error of law and abuse of discretion by changing the goal for all four Children from reunification to adoption when DHS failed to present clear and convincing evidence that such a goal change was in the Children's best interests?

Mother's Brief at 2-3.

We first address Mother's first two questions, in which she challenges the trial court's determination that termination of her parental rights was warranted under Section 2511(a). She asserts, in relevant part, that DHS

---

[4] Mother submitted a Pa.R.A.P. 1925(b) statement contemporaneously with his notice of appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court prepared a responsive opinion.

failed to establish that "the conditions that contributed to Children's placement continue to exist." *Id.* at 12. She asserts that those conditions "have been substantially rectified." *Id.* Specifically, Mother contends:

> Mother's Family Service Plan objectives included that she obtain safe housing, attend a BHS evaluation and Parenting Capacity Evaluation and comply with treatment recommendations, attend medical appointments for the Children, and visit with the Children.
>
> Mother eliminated the exposed wiring in her home and fixed the utility issues. Mother's home was cleared as safe and appropriate. Mother completed the Healthy Relations, Mental Health, and Parent Education courses at the Achieving Reunification Center (ARC). Mother attended individual therapy through Community Counsel consistently from March until December of 2014. Mother completed a psychological evaluation and a parenting capacity evaluation. Mother attended at least some medical appointments for her Children, and expressed a basic understanding of the health concerns with each child in her testimony.
>
> Mother also substantially complied with visitation. The record shows that Mother successfully completed the program at Family School with [C.S.H.] and C.C.R. Further, Family School reports indicated that Mother was an active participant understood what she was learning there. Mother also consistently attended weekly visits with her children, including therapeutic visits.

*Id.* at 13-14 (record citations omitted).

Additionally, Mother notes the her "IQ was determined to be 66" and that "'most of [her] problems can be directly related to her cognitive deficits.'" *Id.* at 14 (citations omitted). She contends:

> Because [she] is cognitively limited, she may require additional assistance to fully grasp the nature of her Children's various conditions. Mother's parenting capacity

evaluation indicated that Mother would benefit from psychoeducation surrounding [Children]'s medical needs, or even intensive case management services to assist Mother in meeting the Children's medical needs. No such psychoeducation was ever provided for Mother, and although Mother was referred to IDS for case management services, her worker did not attempt to assist Mother with following up on the referral. Ms. John testified that she obtained the necessary documentation from Mother and provided it to IDS, but "they just never followed through."

*Id.* (record citations omitted). We are constrained to conclude that no relief is due.

Our standards for reviewing an appeal from an order terminating parental rights are well settled.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, [ ] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [ ] 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

. . . [E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to

- 16 -

> the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.*** (citation omitted).

Section 2511 of the Adoption Act governs the termination of parental rights and requires a bifurcated analysis. ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

***Id.*** This Court may affirm the trial court's determination under Section 2511(a) with regard to any one subsection. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511(a)(8) provides:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

This Court has stated:

Section (a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12–month period has been established, the court must next determine whether the conditions that led to the child[ren]'s removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of DHS services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

Additionally,

Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent.

*In re D.A.T.*, 91 A.3d 197, 205 (Pa. Super. 2014) (citation omitted).

First, Children were adjudicated dependent on November 4, 2013, and DHS filed the termination petitions on December 22, 2015, more than two years later. Therefore, the record establishes that DHS satisfied the first requirement under Subsection (a)(8), namely, the twelve–month time frame for a parent to remedy the conditions that led to the children's removal by the court.

Second, Children were removed from parent's care due to inadequate housing, dangerous conditions in the home, and Mother's and Father's inability to provide for the Children's medical and behavioral needs. With respect to Mother, the trial court heard the following testimony from Dr. William Russell, who conducted the PCEs with Mother:

> Q [by DHS's counsel]. And were there barriers to reunification at this time based on your evaluation?
>
> A. The most critical barriers centered around [Mother's] inability to understand the reasons [C]hildren came into care. Whereas, she just did not know why. She did not see that there were any problems with [Children]. . . .
>
> * * *
>
> [C]hildren were removed and you look at the reasons that they were removed, and you can see this in the DHS summaries, that the household was chaotic, unkempt. There were difficulties managing [C]hildren. . . .
>
> And when we got to 2015 it had been in the interviewing [sic] time supervised therapeutic visits provided to both parents and [C]hildren, where the same difficulty arose, difficulty managing [C]hildren, difficulty controlling

- 19 -

[C]hildren, difficulty acting appropriately with [C]hildren in a very confined environment.

And then my evaluation, again, [Mother] present [sic] depressed, very flat affect. Still did not see any issues or problems. She described to me how her discipline practices worked very well with [C]hildren.

N.T., 7/12/16, at 10-12.

Additionally, there were ten supervised therapeutic visitations with parents. *Id.* at 12-13. The visits were conducted by Dr. Dougal, whom Dr. Russell supervised. *Id.* at 13. Dr. Russell noted:

Supervised therapeutic visits are structured to provide parent or parents an opportunity to interact with the child or children in a very structured therapeutic setting. It's a very confined physical space. It is supervised by a therapist or psychologist. And the timeframe is usually very limited. Subsequent to the actual visitation and interaction with parent and children there's a feedback session where the therapist or psychologist will sit down with the parent or parents and provide them with information regarding the strengths and weaknesses and make suggestions for upcoming visits.

*Id.* Based on the outcome of the supervised therapeutic visitations, Dr. Russell opined that

the parents demonstrated difficulty managing [C]hildren during the visits. They could do very well with one on one, but then that would leave one parent with three children to manage. When it was even two and two they had difficulty enforcing rules, cleanup. They just had a great deal of difficulty getting [C]hildren to respond positively to their direction.

*Id.* at 14.

On further examination by the Child Advocate, Dr. Russell asserted that "in the case of [C]hildren, you have children with hyperactivity, children with autism. Clearly these are children with behavioral difficulties as both record reflected and as our evaluation reflected." *Id.* at 16. When asked whether Mother "seem[ed] to understand the significance of [C]hildren's diagnoses[,]" Dr. Russell answered "No, she did not." *Id.*

Dr. Russell's testimony was corroborated by Ashley John, a DHS social worker, who testified that reunification was ruled out "due to [M]other not being able to comprehend the medical and mental health needs of [C]hildren." N.T., 4/20/16, at 18. Ms. John continued: "All [C]hildren exhibit both medical and mental health needs that the parents need to focus on. And [Mother] was not able to comprehend the needs and age appropriate developmental tests for each child." *Id.* Ms. John further noted that Mother and Father "felt like [Children's] needs were being met and that's what they were doing from the beginning and that DHS, there was no need for DHS involvement." *Id.* at 33.

Thus, it is apparent Mother had taken steps to remedy the conditions that led to the removal of Children, including the harmful condition in the family residence and complying with the FSP goals initially set for her. Nevertheless, after approximately two years, Mother made little progress in her ability to manage Children and tend to their medical, mental health, and

developmental needs. Accordingly, the conditions leading to Children's removal continued to exist.

Third, in addition to the testimony that Mother did not comprehend the medical, mental health, and developmental needs of Children, the trial court heard testimony regarding the bonds between Mother and Children. Brenda Hodges, a case manager at The Village, testified that she observed bonding among the family, but the bond was more "like friends getting together." N.T., 4/20/16 at 57. She noted that during the weekly visits, "[t]he family gets together for a meal in a controlled setting they do well, but as soon as the meal is over [Father] sits on the sofa and [Mother] basically attempts to engage with [C]hildren, but they each come and go in their own direction. They're not really interacting." *Id.* at 56-57.

Janaya Davis, a case supervisor at The Village, testified that Mother

> did try to interact with each one of the children individually, but at times it would be difficult for her because she was focused more on [C.S.H.] She would take [C.S.H.] and [C.C.R.] to get their diapers changed. She would ask [C.B.-A.R.], "How's school?" And [C.D.R, Jr.] and [C.B.-A.R.] how school was but that was pretty much the extent of it.

*Id.* at 53. Ms. Davis noted that there was "[n]ot really" physical interaction with Children, but acknowledged they would hug when they said goodbye. *Id.* Ms. Davis further asserted that Children—in particular, C.B.-A.R. and C.S.H., whom she supervised—did not ask when they would be able to return home with Mother. *Id.*

Therefore, the record contains sufficient evidence to conclude that termination would best serve the needs and welfare of Children under Section 2511(a)(8).

To the extent Mother raises the lack of services for her intellectual disability, we are constrained to reiterate that reasonable efforts toward reunification are not required before the filing of a petition to terminate parental rights. *See In re D.C.D.*, 105 A.2d 662, 675 (Pa. 2014) (holding "nothing in the language or the purpose of Section 6351(f)(9) [of the Juvenile Act, 42 Pa.C.S. §§ 6301-6375] forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent"). In any event, Ms. John testified that she assisted Mother in the registration process for social security and IDS. N.T., 4/20/16, at 35. However, Ms. John maintained that "from there [Mother] had to follow up with appointments . . . ." *Id.* Mother, in turn, testified as follows:

> Q [by Child Advocate]. At one point it was recommended that you apply for IDS Intellectual Disability Services. Did you ever apply for that?
>
> A. Yes.
>
> Q. Are you receiving IDS?
>
> A. Not yet. I didn't hear nothing back from them yet.
>
> Q. Okay when did you contact them?
>
> A. I didn't contact them yet but I thought they were supposed to send me something out in the mail.

N.T., 7/12/16, at 41-42. Thus, the record belies Mother's suggestion that DHS failed to undertake reasonable efforts to carry out her appointments with IDS.

In light of the foregoing, we conclude that there was sufficient evidence that termination would be in the best interests of the needs and welfare of Children under Section 2511(a)(8). Accordingly, we discern no error in the trial court's determination that DHS presented clear and convincing evidence for termination under Section 2511(a).

Mother next argues that the trial court erred in finding termination of her parental rights was warranted under Section 2511(b). She contends the court (1) "erroneously concluded that 'there's no evidence that [the loss of] that bond could not be remedied with the appropriate therapy[ ]'" and (2) improperly "cited the bond between the Children and their respective caretakers in support of the conclusion that the Children would not suffer irreparable harm if the bond with their Mother was permanently severed." Mother's Brief at 16. No relief is due.

Section 2511(b) states:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511 (b).

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*. (citation omitted).

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (some citations omitted).

Moreover, our Supreme Court stated that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (citation omitted).

The **T.S.M.** Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id.** at 269. The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

As noted above, the trial court heard evidence that although there was a bond between Mother and Children, the bonding appeared minimal. Moreover, the trial court also heard ample evidence that Children were in pre-adoptive foster homes, were having their needs and welfare met, and were bonding with their respective foster parents. For example, Ms. John asserted:

> [C.D.R., Jr. is] able to know who his biological parents are and foster parents. DHS has had several conversations with him. The child is willing and wants to remain in the care of his foster parent. He does have a close bond. They do may [sic] activities. His mental health, his needs overall is being met by the foster parent and the child enjoys the relationship he has with the foster parent and her other children in the home.

**Id.** at 20-21. Ms. John testified that C.C.R. has been in foster parent's care since "he was a couple months old[,] he considers [foster parent] his mom and he has a deep connection and a bond with [her] and considers her to be his mother." **Id.** at 21.

Similarly, Ms. Davis noted that C.B.-A.R. and C.S.H. have been with their foster parent for one and a half years. N.T., 4/20/16, at 49. She

noted that their foster parent worked to correct some of the behavioral issues with Children, including C.B.-A.R.'s past tendency to grab items, such as candy, from the floor, as well as C.S.H.'s potty-training. *Id.* at 49-50. Ms. John testified that C.B.-A.R. called her foster mother "mom." *Id.* at 23.

Contrary to Mother's suggestion, such factors are germane to the trial court's assessment of the needs and welfare of Children under Section 2511(b). *See In re T.S.M.*, 71 A.3d at 268. Moreover, the trial court heard testimony that adoption would be in the best interests of Children, that although a bond existed between Mother and Children, Children's bonds with their parents was not appropriate, and that the effects of the termination of those bonds could be managed with therapy. *See* N.T., 4/20/16, at 18-20, 50-51, 58. In light of the foregoing, we affirm the trial court's determination to terminate Mother's parental rights under Section 2511(b).

Mother lastly contends that the trial court erred in changing the family's goal from reunification to adoption. According to Mother, the goal change to adoption is not "best suited" to the needs and welfare of Children. Mother claims that adoption would sever the bonds between Children and Mother, as well as the sibling relationships among C.B.-A.R. and C.S.H., on the one hand, and C.D.R., Jr. and C.C.R., on the other. We discern no basis to disturb the trial court's decision to change the goal to adoption.

Our standard of review is as follows:

> When reviewing an order that changes the placement goal
> of a dependent child from reunification to termination of

parental rights and adoption pursuant to the Juvenile Act, our standard of review is abuse of discretion. . . .

> When reviewing such a decision we are bound by the facts as found by the trial court unless they are not supported in the record. Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interests and not those of his or her parents.

***In re G.P.-R.***, 851 A.2d 967, 973 (Pa. Super. 2004) (citations omitted).

Section 6351 requires the trial court to determine, *inter alia*, "[i]f and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(f.1)(2).

> [T]he focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency, and well-being of the child. The best interests of the child take precedence over all other considerations, including the conduct and the rights of the parent. . . . [W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors.

***In re M.T.***, 101 A.3d 1163, 1175 (Pa. Super. 2014) (citation omitted).

Although the trial court did not address this issue in its Rule 1925(a) opinion, we discern no merit to Mother's argument that the trial court erred in granting a goal change from reunification to adoption. As noted above, the trial court appropriately considered the needs and welfare of Children, its findings were supported by the record, and its balance between Children's

bonds with parents, their bonds with their respective foster parents, and Children's interests in safety, permanency, and well-being evince no abuse of discretion or error of law. *See In re G.P.-R.*, 851 A.2d at 973. Moreover, we note that "the general rule disfavoring separation of siblings . . . is not controlling." *In re R.P.*, 956 A.2d 449, 458 (Pa. Super. 2008.). Thus, we conclude Mother's argument warrants no relief.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/24/2017